# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PATRICK E. MAHONEY, SR.,**

        **Plaintiff,**

-vs-　　　　　　　　　　　　　　　　　　　　　　　Case No. 6:05-cv-741-Orl-31KRS

**NOKIA, INC.,**

        **Defendant.**

_____/

# ORDER

Patrick Mahoney ("Mahoney") sued Nokia, Inc. ("Nokia") for a violation of the Family and Medical Leave Act, 29 U.S.C. section 2601, et seq. (the "FMLA"). (Doc. 2). This matter is presently before the Court on Nokia's Motion for Summary Judgment and Memorandum in Support thereof (Docs. 43 and 44, respectively), and Mahoney's Memorandum in Opposition thereto (Doc. 50).

**I.    Background**

    A. Facts

    *1) Application and hiring*

Mahoney, a resident of Brevard County, Florida, submitted an employment application to Spherion Atlantic Workforce ("Spherion") on February 27, 2002.[1] (Doc. 45, Att. 2 at 92-93; Att. 12 at 2). At that time, Mahoney understood that he was applying for a job with, and would be employed by, Spherion.[2] (Doc. 45, Att. 2 at 93, 101). On that same day, Mahoney signed a

---

[1] Mahoney originally named Spherion as a defendant in this matter, but later settled his claims against Spherion, (*see* Doc. 41), and Spherion was dismissed from this case (Docs. 42, 47, 48).

[2] The "applicant profile" includes the word "Spherion" in large text at the top of the first page. (Doc. 45, Att. 12).

Spherion document entitled "Policies and Procedures - Application Supplement," which contained several "acknowledgments," including the following:

- Upon acceptance of employment with Spherion, I therefore agree to the following . . . .

- I understand that Spherion is my employer and I will address all problems and concerns directly with Spherion, never the client. I understand that Spherion will communicate with the client for me.

- I understand that Spherion is my employer and while on assignment I will call them if I am going to be late or absent from my assignment or to address any employment issues.

- I understand that I am employed by Spherion and not a client to which I may be assigned and that I am not eligible to participate in any client profit sharing, pension, welfare benefit, bonus or other compensation or benefit plan of a client made available to its employees.

- I will notify Spherion immediately if any client offers me direct employment . . . before accepting any offer.[3]

(Doc. 45. Att. 13). Mahoney became a Spherion employee on February 28, 2002. (Doc. 50, Att. 15 at 47).

*2) Relationship between Nokia and Spherion*[4]

Nokia and Spherion were involved in a relationship whereby Nokia engaged Spherion to lease workers, including Mahoney, to Nokia on a temporary basis.[5] (Doc. 45, Att. 1 at 1-2; Att. 5 at 18). Spherion paid the employees that it provided to Nokia, and Nokia then paid Spherion for

---

[3] Curiously, however, Mahoney states that he did not understand that Spherion would be his employer and that he should raise any concerns with Spherion. (Doc. 45, Att. 2 at 101).

[4] Nokia has not challenged its status as an "employer" within the meaning of 29 U.S.C. § 2611(4).

[5] Mahoney was aware that Spherion is a staffing service that hires people and then assigns them to jobs at various companies. (Doc. 45, Att. 2 at 92). When he applied for a job at Spherion, Mahoney did not specifically apply expecting to be assigned to a position at Nokia. (*Id*. at 93).

providing that workforce.[6] (Doc. 45, Att. 5 at 18; Doc. 50, Att. 14 at 18). Spherion employees were not considered to be Nokia employees. (Doc. 45, Att. 4 at 113). Indeed, there were a number of differences between Spherion and Nokia employees, such as the benefits programs available, corrective action processes, holidays, bonus programs, pay increases, and Workers' Compensation funding. (Doc. 45, Att. 5 at 19). When Spherion employees underwent orientation at Nokia, which was conducted by Nokia employees, Nokia's trainers did not suggest that the Spherion employees were becoming Nokia employees. (Doc. 45, Att. 6 at 72; Doc. 50, Att. 15 at 13-14).

*3) Mahoney's assignment at Nokia; supervision*

In response to a Nokia "work order," Spherion assigned Mahoney to work as an assembler in Nokia's Melbourne, Florida manufacturing facility.[7] (Doc. 45, Att. 1 at 2). No one from Nokia interviewed or selected Mahoney before he was assigned to the Nokia facility, and Spherion made the decision as to which employee(s) to send to Nokia to fill Nokia's work orders.[8] (*Id*.; Att. 2 at 138-39; Att. 3 at 72-73; Att. 4 at 113). Spherion gave Mahoney a copy of a handbook entitled "Spherion @ Nokia Employee Guidelines," which contained a section regarding employment status, that included the following language:

> All Spherion employees working at Nokia are considered temporary and are not Nokia employees. Temporary employees are not entitled to the same privileges and benefits as Nokia employees; . . . As a temporary employees, there are no guarantees of employment with Nokia.

---

[6] Spherion charged Nokia a premium for providing employees such as Mahoney. (Doc. 50, Att. 15 at 25).

[7] Mahoney began working at the Nokia facility on March 5, 2006. (Doc. 50, Att. 15 at 47).

[8] Nokia also played no role in Spherion's decision to hire Mahoney. (Doc. 45, Att. 1 at 2).

(Doc. 45, Att. 2 at 133; Att. 14).[9]  Mahoney acknowledges reading this document after he received it from Spherion. (Doc. 45, Att. 2 at 135).

Spherion paid Mahoney and performed all payroll processing functions for Spherion employees working at Nokia's facility. (Doc. 45, Att. 1 at 2; Att. 3 at 73). Mahoney never received a paycheck from Nokia. (Doc. 45, Att. 1 at 2; Att. 2 at 117; Att. 3 at 74). Mahoney had the option to receive employment benefits from Spherion. Nokia did not offer health insurance or any other benefits to Spherion employees, and Mahoney was not eligible to receive benefits from Nokia. (Doc. 45, Att. 1 at 2; Att. 3 at 74; Att. 6 at 69).[10]  Mahoney did not receive a description of benefits from Nokia. (Doc. 45, Att. 2 at 138). Nokia did not recognize Mahoney as a Nokia employee, and no one at Nokia ever told Mahoney that he was a Nokia employee.[11]  Indeed, Mahoney admits that Nokia never hired him directly. (Doc. 45, Att. 2 at 118).

During the first few months of his assignment, until approximately late June of 2002, Mahoney worked as an assembler, programming and placing plastic covers on cell phones.[12]  (Doc. 45, Att. 2 at 150-52; Doc. 50, Att. 4). He subsequently worked as a materials handler, repairing

---

[9] Mahoney did not receive a similar document, such as an employee handbook, from Nokia. (Doc. 45, Att. 2 at 134).

[10] Nokia did permit Spherion employees to share in Nokia's Gain Share Bonus Program, because Spherion employees did the same work and helped Nokia earn money. (Doc. 50, Att. 12 at 20-21). Nokia would establish performance goals, and employees who reached those goals were given a bonus. (Doc. 50, Att. 13 at 13). Spherion would pay the bonus to the Spherion employees that reached those goals, and Nokia reimbursed Spherion for those payments. (Doc. 50, Att. 13 at 13-14; Att. 15 at 26).

[11] Nokia representatives unanimously state that Mahoney was never employed by Nokia. (*See, e.g.*, Doc. 45, Att. 1 at 2; Doc. 50, Att. 14 at 36).

[12] Spherion had no role in creating job descriptions for those employees working at Nokia's facility. (Doc. 50, Att. 14 at 33).

phone accessories. (Doc. 45, Att. 2 at 150, 152). Nokia employees made the decision to transfer Mahoney to the materials handler position. (Doc. 50, Att. 12 at 11). Before doing so, however, they checked with Spherion to ensure that such a move was acceptable, because they were not able to make such a transfer without coordinating with Spherion's managers. (*Id*. at 12-13). Mahoney used Nokia's tools and machines in performing his job duties, and he worked a plant that Nokia leased. (Doc. 45, Att. 2 at 150, 152; Att. 5 at 34).

Spherion maintained an on-site supervisor, David Lunn ("Lunn"), at Nokia's plant at all times. (Doc. 45, Att. 2 at 139-40). Lunn's job was to hire and manage the Spherion employees that worked at Nokia. (Doc. 45, Att. 4 at 10). Mahoney does not believe that this person was his supervisor, however, because he received all of his work "and all the details" directly from Nokia. (Doc. 45, Att. 2 at 140). More specifically, his supervisors for the various departments in which he worked were Nokia employees and they would provide him with his working instructions. (*Id*.; Doc. 50, Att. 12 at 17). Mahoney denies ever receiving any instructions regarding his work from Lunn. (Doc. 45, Att. 2 at 140-41). Nokia employees also told him what schedule he should follow for taking breaks, and would train new workers on how to perform their jobs. (*Id*. at 141; Doc. 50, Att. 12 at 18-19, 30-31; Att. 14 at 31). Nokia also determined the hours for which they needed workers, and Spherion provided labor to fit those requests. (Doc. 50, Att. 12 at 25). Spherion could not, however, set the schedule for those employees. (*Id*.). Instead, Spherion worked with Nokia, who would provide input and then the two parties would attempt to reach an agreement on employees' schedules. (Doc. 50, Att. 15 at 35-36). Ultimately, Spherion "had to take [their] marching orders from [their] customer, as far as what their requirements [were]." (*Id*. at 35). At the same time, however, Spherion had the authority to make the decision to schedule workers as it saw fit in order to fill a request placed by a customer. (*Id*. at 75).

Danny Painter ("Painter"), a Nokia employee, filled out several employee evaluation reports for Mahoney. (Doc. 50, Att. 12 at 26-27). Spherion asked him to do so because Mahoney worked in his department.[13] (*Id*. at 28).[14] Nokia did not receive a copy of those evaluations; instead, they were sent directly to Spherion. (*Id*.). However, when Nora Ellis, Nokia's human resources manager ("Ellis"), discovered that Painter was filling out performance evaluations for Spherion employees, she told him to stop doing so, because she believes it was inappropriate for a Nokia employee to fill out evaluations for individuals, such as Mahoney, who did not work for Nokia. (Doc. 45, Att. 5 at 35-36).

*4) Mahoney's physical difficulties*

Mahoney believes that during the time he worked for Spherion he was handicapped because he suffered from back and neck injuries (resulting from an accident in 1991), as well as an arthritic condition in his knee, that made it difficult for him to walk and to lift objects. (Doc. 45, Att. 2 at 164-65). He did not suffer from any mental or emotional handicaps during his employment at Spherion. (*Id*. at 166-67). This difficulty with walking interfered with his ability to accomplish the tasks he was assigned at Nokia because it took him additional time to complete various tasks. (*Id*. at 175). He was, however, able to complete the tasks and to get his job done.[15]

---

[13] Painter states that it was part of his job as a Nokia supervisor to assess the performance of the Spherion employees assigned to him. (Doc. 50, Att. 12 at 28-29). He did not, however, have the authority to dismiss a Spherion employee or to issue written counseling or take corrective action regarding a Spherion employee. (Doc. 50, Att. 15 at 41).

[14] Marjorie Bartok, the owner and president of Spherion Staffing in Brevard County, Florida ("Bartok"), states that it was customary in Spherion's business and in its relationship with Nokia for Nokia's supervisors to issue evaluations of Spherion employees. (Doc. 50, Att. 15 at 38).

[15] Mahoney states that he could perform all of the functions of his job, although it required "painful effort," and that he was able to do so without any particular accommodations. (Doc. 45, Att. 2 at 241).

(*Id*. at 175-76; Doc. 45, Att. 9 at 6).  At one point, his inability to meet certain quotas resulted in his transfer between departments.  (Doc. 45, Att. 2 at 177).

*5) Mahoney requests a shorter work week*

During the time he worked as an assembler, Mahoney did not make a request for an accommodation to anyone at either Spherion or Nokia.  (Doc. 45, Att. 2 at 194).  However, he made multiple requests for a shorter (30-hour) work week to Lunn, starting in June of 2002.  (Doc. 45, Att. 2 at 311-12, 315).  He provided Lunn with four notes from doctors,[16] and each time he would discuss the matter with Lunn, and Lunn would indicate that he (Lunn) would handle the situation.[17]  (*Id*. at 312-13).  Mahoney estimates that spoke with Lunn about a shorter work week nine or ten times.  (*Id*. at 314-15).

Mahoney spoke with Painter, as well as several of his colleagues, about his request for a shorter work week.  (Doc. 45, Att. 2 at 130; Doc. 50, Att. 13 at 20).  He did not, however, discuss the matter with anyone else in Nokia's management.  (*Id*.).  Painter states that if a Spherion employee requests an accommodation, then Nokia supervisors discuss the matter with Spherion management.[18]  (Doc. 50, Att. 12 at 49, 59-60).  When Mahoney raised the issue with Painter, Painter referred him to Lunn.  (*Id*. at 50).

---

[16] These notes are dated June 20, 2002, November 11, 2002, January 29, 2003, and January 31, 2003.  (Doc. 45, Atts. 15, 16, 17, 18).

[17] Spherion would have had to get Nokia's consent to employ Mahoney on a reduced hour schedule.  (Doc. 50, Att. 15 at 22).

[18] If a Spherion employee had a problem that needed to be addressed immediately, they could address it with a Nokia supervisor, who would then provide the relevant information to Spherion.  (Doc. 50, Att. 15 at 42).

Mahoney understood that he needed to address concerns with David Lunn ("Lunn"), and Mahoney "went to him, all the time." (Doc. 45, Att. 2 at 106). At some point in January or early February of 2003, however, Mahoney became frustrated with Lunn and went instead to speak with Ellis.[19] (Doc. 45, Att. 2 at 107-109, 114-115).[20] Ellis told him that she would speak with Lunn to assess Mahoney's situation. (*Id*. at 114). Ellis does not recall whether Mahoney specifically asked for a reduced work schedule because of a medical condition. (Doc. 45, Att. 5 at 25-26). In any event, Ellis states that she would not have inquired into Mahoney's reasons, because he was a Spherion employee, and thus she would have referred him to Lunn. (Doc. 45 Att. 2 at 25-26). Ellis did not tell Mahoney that there were no part time positions available, nor did she attempt to determine whether he could be assigned to a 30-hour workweek, because, as she states, Mahoney "was not a Nokia employee." (*Id*. at 27-28).

On January 30, 2003, Kerry Lennon, a Spherion employee, sent an email to Lunn, noting that Spherion's legal department believed that "Nokia should allow Mr. Mahoney to work the 6 hours per day as request (sic) by his doctor," but that it was "up to Nokia not Spherion to determine whether" to accommodate Mahoney's request. (Doc. 50, Att. 6). A subsequent email, dated March 18, 2003, from Lunn to Lennon, noted that Nokia had heard from their (Nokia's)

---

[19] Mahoney admits that he does not know the specific dates of his conversations with Ellis regarding a reduced schedule. (Doc. 45, Att. 9 at 6).

[20] Mahoney indicates that he stopped believing that Spherion was his employer when he continued to ask them about a shorter work week, but they continued to be unresponsive. (Doc. 45, Att. 2 at 117). He also acknowledges, however, that he "was employed by Spherion until Nokia hired" him, and states that Nokia did not hire him. (*Id*. at 136). It was his belief that he worked "particularly for Spherion," but that Nokia "had charge of" him. (*Id*. at 137).

legal department and were aware that because Mahoney had worked at Nokia for over a year he may have been protected under the FMLA. (Doc. 50, Att. 9).

Spherion did not provide part-time assemblers to Nokia, nor, with one exception, did Spherion provide any part-time workers to Nokia.[21] (Doc. 45, Att. 4 at 115-16). The position of materials handler required a person to work for forty hours per week. (Doc. 50, Att. 12 at 14, 50). Nokia did not have a policy for temporary or contract workers to have part-time employment. (Doc. 50, Att. 13 at 36). Instead, they needed, and thus requested, forty hours per shift.[22] (*Id*.; Att. 14 at 45).

*6) Mahoney's work at Nokia ends*

Mahoney received a phone call at his home on March 24, 2003, asking him to report to Spherion's office. (Doc. 45, Att. 2 at 119). Mahoney spoke with Bartok, who advised him that Nokia would not accommodate him and that Spherion was going to have to let him go.[23] (*Id*. at 118, 124; Doc. 50, Att. 15 at 22-23). No representative of Nokia participated in the meeting, nor did anyone from Nokia advise him that they would not honor his request for a shorter work week. (Doc. 45, Att. 2 at 120, 124).[24] Spherion ended Mahoney's assignment at Nokia on March 24,

---

[21] The single exception was a part-time administrative worker who filled a position Nokia created, which position only required part-time help. (Doc. 45, Att. 4 at 115-16).

[22] Nokia had "head count constraints" for the number of people they were allowed to employ that they were not permitted to exceed. (Doc. 50, Att. 14 at 17-18). Thus, a certain percentage of their workforce would consist of temporary employees. (*Id*. at 18). In addition, Nokia needed to ship a certain number of units each month to meet their goals, and thus they did not want to set a precedent of permitting temporary workers to work reduced hours. (*Id*. at 74).

[23] Ellis believes that Mahoney stopped working at Nokia's facility because he requested part-time work which was not available. (Doc. 50, Att. 14 at 44-45).

[24] Nokia did have the ability to identify those Spherion employees that were going to "be let go" when their contract was no longer needed. (Doc. 50, Att. 13 at 64). Nokia would inform Spherion

2003, after which time he remained a Spherion employee.[25] (Doc. 45, Att. 2 at 331; Doc. 50, Att. 15 at 16). No one from Nokia discussed the termination of his assignment with him or told him to stop reporting to work at Nokia's facility. (Doc. 45, Att. 2 at 285). Nokia did not have the authority to terminate Mahoney's employment with Spherion, and played no role in the termination of Mahoney's employment at Spherion.[26] (Doc. 45, Att. 1 at 2; Att. 3 at 74).[27]

Mahoney believes that he was fired, but does not distinguish between being fired from his assignment at Nokia and his employment at Spherion. (Doc. 45, Att. 2 at 125).

B. Claims and Arguments

Mahoney has asserted a single claim against Nokia for "denial of medical leave under the FMLA." (Doc. 2 at 5).[28] He asserts that he provided medical information regarding his need for a thirty hour work week, based on which Nokia knew or should have known that he was entitled to FMLA leave, but that Nokia failed to give him notice of his eligibility for FMLA leave and terminated him in lieu of granting him the FMLA leave to which he was entitled, in violation of 29 U.S.C. section 2615(a)(1) and 29 C.F.R. sections 825.301-302.

---

of their request that a Spherion employee be dismissed, and then Spherion would ask why, and then make the decision to dismiss the employee based on the customer's request. (Doc. 50, Att. 15 at 40).

[25] Mahoney also states, however, that his employment with Spherion was terminated during that meeting. (Doc. 45, Att. 2 at 318).

[26] Mahoney believes, however, based on his discussion with Bartok, that Nokia made the decision to end his assignment at the Nokia facility. (Doc. 45, Att. 2 at 316).

[27] Nokia could, however, request that a Spherion employee be removed from their Nokia assignment, but that individual would remain a Spherion employee. (Doc. 45, Att. 3 at 74).

[28] Mahoney originally also asserted a claim for disability discrimination under the Florida Civil Rights Act, but subsequently stipulated to the dismissal of that claim with prejudice. (*See* Docs. 38, 39).

Nokia has moved for summary judgment, arguing that it was not Mahoney's primary employer and therefore had no duty to give him notice of his FMLA rights or to provide him with FMLA leave. In addition, Nokia argues that it is entitled to summary judgment because there is no evidence that Mahoney exercised his FMLA rights during the time when he was an eligible employee under the FMLA, there is no evidence that Mahoney suffered from a qualifying serious health condition, and that during his employment with Spherion, Mahoney was able to perform the functions of the position to which he was assigned at Nokia.

## II.     Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25;

*Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[29]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III. Legal Analysis

The FMLA provides, in relevant part, that

> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> . . .
>
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(1)-(2). The FMLA defines "employer" as

> (i) . . . any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

---

[29] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

>> (ii) includes --
>
>> (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer . . . .

29 U.S.C. § 2611(4)(A). The facts of this case bring it within the purview of 29 C.F.R. section 825.106 ("Section 825.106"), which addresses "joint employment," as follows: "[w]here two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA." 29 C.F.R. § 825.106(a). Notwithstanding Mahoney's lengthy discussion of the joint employment issue, Nokia does not appear to contest the fact that a joint employment relationship existed. (*See* Doc. 44 at 8 (noting that the question of *whether* a joint employment relationship exists "is irrelevant here because a joint employment relationship is assumed by the applicable regulation")). Instead, Nokia asserts that it can only be considered Mahoney's secondary, not primary, employer for purposes of determining FMLA liability in the joint employer context.

While a secondary employer is still an employer of the employee, it does not have the same FMLA obligations as the primary employer. *Salgado v. CDW Computer Centers, Inc.*, 1998 WL 60779 at *3 (N.D. Ill. Feb. 5, 1998). Section 825.106 addresses the distinction between primary and secondary employers in the context of a joint employer relationship, as follows:

> In joint employment relationships, only the primary employer is responsible for giving required notices to its employees, providing FMLA leave, and maintenance of health benefits. Factors considered in determining which is the "primary" employer include authority/responsibility to hire and fire, assign/place the employee, make payroll, and provide employment benefits. For employees of temporary help or leasing agencies, for example, the placement agency most commonly would be the primary employer.

29 C.F.R. § 825.106(c); *see also Moreau v. Air France*, 356 F.3d 942, 946 (9th Cir. 2004) ("The regulations distinguish between the 'primary employer' and the 'secondary employer';" *citing* 29

C.F.R. § 825.106(c)). Thus the Court will examine the factors set out in Section 825.106 to determine whether Nokia was Mahoney's primary employer.[30]

A. Section 825.106 Factors

*1) Authority/responsibility to hire and fire*

Nokia played no role in Spherion's decision to hire Mahoney. Nokia employees lacked the authority to fire Mahoney, and even those Nokia employees who participated in evaluating Mahoney's work did not have the authority to either take correction action or to dismiss him. Nokia did have the ability to identify Spherion employees that would be let go when their contract was no longer needed. Ultimately, however, when Nokia wished to dismiss a Spherion employee, Nokia would inform Spherion of their request and then Spherion would make the ultimate decision and take the necessary action. When Mahoney's relationship with Spherion ended, no Nokia representative participated, discussed the termination of his assignment with him, or told him to stop reporting to work at Nokia's facility. These factors demonstrate that Spherion was Mahoney's primary employer.

*2) Authority/responsibility to assign/place the employee*

Mahoney was assigned to work at Nokia by Spherion. Spherion received a work order from Nokia, and in response, assigned Mahoney in order to fill that order. Indeed, no one from Nokia interviewed or selected Mahoney before Spherion assigned him to work at Nokia, because Spherion made the decision as to which employees to use to fill Nokia's work orders.

Upon arriving at Nokia, Mahoney received orientation and training from Nokia employees. Nokia employees also supervised him, provided him with working instructions, and told him what

---

[30] The Court notes that it was unable to find caselaw providing any insight into the interpretation and/or application of these elements.

-14-

the schedule was for taking breaks. When Mahoney was transferred to a new position, Nokia employees made that decision. However, Nokia employees had to check with Spherion before making the transfer, because Nokia employees could not make such a transfer without coordinating the move with Spherion.

It is not clear which employer had the final authority for scheduling the hours Spherion employees worked. Nokia would advise Spherion of the hours for which Nokia needed workers, and Spherion worked to fill those requests. At the same time, however, Spherion was able to decide whether to schedule workers to fill a client's request.

The Court finds that these factors weigh in favor of a finding that Spherion was Mahoney's primary employer, particularly because Spherion made the decision to send Mahoney to Nokia without input from Nokia. The fact that Nokia employees trained, supervised and instructed Mahoney does not necessarily indicate that Nokia was his primary employer. As an employee leasing service, Spherion would not be in a position to engage in those tasks, and it follows that employees of the company to whom a leased employee was assigned would be the ones to instruct that leased employee on the functions of the particular job position at issue. The fact that Nokia employees told Mahoney how to do his job does not conclusively demonstrate that Nokia was Mahoney's primary employer.

*3) Making payroll*

Spherion paid the employees that it provided to Nokia, and Nokia then paid Spherion for providing that workforce. Spherion performed all of the payroll processing functions for the Spherion employees working at Nokia's facility. Mahoney never received a paycheck from Nokia. These considerations all demonstrate that Spherion was Mahoney's primary employer.

*4) Providing employment benefits*

The benefits programs, holidays, bonus programs, pay increases and Workers' Compensation funding available to Spherion employees all differed from the programs for Nokia employees. Mahoney had the option to receive employment benefits from Spherion, but was not eligible to receive benefits from Nokia. Nokia did, however, permit Spherion employees to share in Nokia's Gain Share Bonus Program. These factors demonstrate that Spherion was Mahoney's primary employer, and the fact that Mahoney was able to share in a single Nokia bonus program does not compel a contrary conclusion.

*5) Other considerations*

In addition to those factors listed in Section 825.106, the Court finds that a number of other considerations are relevant in this case. First, the "Policies and Procedures" document that Mahoney signed, as well as the "Spherion @ Nokia Employee Guidelines," both clearly state that Spherion was his employer and that he was not employed by Nokia. Those documents further state that he was to call Spherion (not Nokia) if he were going to be late or absent from his assignment at Nokia, he was not eligible to participate in Nokia's benefit programs, and that he was not guaranteed employment with Nokia. The relationship between Spherion and Nokia, and the status of Spherion employees, was therefore crystalized in plain writing. In addition, those documents state that as a Spherion employee, he was to address all concerns directly with Spherion, not Nokia, and this policy was given effect by Nokia employees, who, when Spherion employees raised employment concerns, would refer that Spherion employee to Spherion's human resource personnel. It almost begs the question to ask why, if Nokia were Mahoney's primary employer, he would be required to address all employment-related concerns to Spherion.

Next, there are several discrete factors indicating that Spherion, not Nokia, was Mahoney's primary employer, including: (1) when Mahoney applied for a job at Spherion, he did not do so expecting an assignment at Nokia; (2) Nokia did not recognize Mahoney as a Nokia employee, and Nokia employees repeatedly emphasized that Nokia did not employ him; and (3) Mahoney admits that Nokia never directly hired him.

Finally, the Court notes that subsection (c) of Section 825.106 contains what appears to be almost a presumption in favor of finding that Spherion was Mahoney's primary employer. The last sentence of that subsection states that "[f]or employees of temporary help or leasing agencies . . . the placement agency most commonly would be the primary employer." 29 C.F.R. § 825.106(c). Clearly, Spherion is a temporary help or leasing agency, of which Mahoney was an employee, and Section 825.106 recognizes that in most such situations, Spherion would thus be Mahoney's primary employer.

B. Section 825.106(e)

Mahoney's next argument is that even if Nokia is only considered a secondary employer, Nokia is liable because Section 825.106(e) imposes the responsibility on secondary employers to comply with the prohibited acts provisions of the FMLA. Subsection (e) of Section 825.106 provides, in relevant part, that

> [a] secondary employer is also responsible for compliance with the prohibited acts provisions with respect to its temporary/leased employees, whether or not the secondary employer is covered by the FMLA (see § 825.220(a)). The prohibited acts include prohibitions against interfering with an employee's attempt to exercise rights under the Act, or discharging or discriminating against an employee for opposing a practice which is unlawful under FMLA.

29 C.F.R. § 825.106(e). The Court rejects Mahoney's argument, because it does not appear that subsection (e) applies to this case.

First, subsection (e) begins by stating that "job restoration is the primary responsibility of the primary employer." 29 C.F.R. § 825.106(e). It goes on to state that

> [t]he secondary employer is responsible for accepting the employee returning from FLA leave in place of the replacement employee if the secondary employer continues to utilize an employee from the temporary or leasing agency . . . .

*Id*. Thus, it seems clear that, on its face, subsection (e) applies in cases involving the right of an employee to return to work following FMLA leave, which is not at issue here. This conclusion is strengthened when one examines the language of 29 C.F.R. section 825.214, which specifically addresses the rights of employees upon returning to work from FMLA leave. That section lists an employee's rights, and specifically refers to Section 825.106(e) "for the obligations of joint employers," which can only reasonably be interpreted to mean "the obligations of joint employers *when an employee returns to work from FMLA leave*."[31]  It thus appears that the context in which the "secondary employer" language of subsection (e) applies is limited.

Further, courts examine and interpret regulations in the same manner as they interpret statutes. *See Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1050 (10th Cir. 2004); *Resnik v. Swartz*, 303 F.3d 147, 151-52 (2nd Cir. 2002). In interpreting statutes, courts first look to the plain meaning of the statutory language.

---

[31] Indeed, the only cases the Court was able to find in which a citation to 825.106(e) appears were those in which the rights of an employee upon returning from FMLA leave were at issue. *See Harrell v. U.S. Postal Serv.*, 445 F.3d 913 (7th Cir. 2006); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238 (6th Cir. 2004); *Cline v. Home Quality Mgmt., Inc.*, 2004 WL 746291 (S.D. Fla. Mar. 18, 2004). Even those cases, however, do not discuss Section 825.106(e), and instead simply quote 29 C.F.R. section 825.214 which, in turn, directs the reader to Section 825.106(e). In any event, the words of a statute are known by their company, and should be interpreted in light of the surrounding language (*noscitur a sociis*), *Gutierrez v. Ada*, 528 U.S. 250, 254-55 (2000); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694 (1995), and this canon of construction reinforces the Court's conclusion that the language in Section 825.106(e) upon which Mahoney relies only applies in situations involving "job restoration."

*Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1247 (11th Cir. 2005).  When examining statutory language, courts have a duty to give effect to every word and clause of the statute, *Chew Hing Lung & Co. v. Wise*, 176 U.S. 156, 159 (1900); *Inhabitants of the Township of Montclair, County of Essex v. Ramsdell*, 107 U.S. 147, 152 (1883), and to construe the statute in such a way as to give effect to each of the statute's provisions.  *U.S. v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995).  One part of a statute should be construed with another so that the entire thing may stand, and statutory language should not be rejected if it can be harmonized and all words can be given their proper purpose and effect.  *Crabb v. Zerbst*, 99 F.2d 562, 564 (5th Cir. 1938).  For the Court to read the language of subsection (e) to support Mahoney's claim that Nokia interfered with his FMLA rights by failing to accommodate him would bring that language into direct conflict with subsection (c), which specifically states that "*only the primary employer* is responsible for giving required notices to its employees, [and] *providing FMLA leave*." 29 C.F.R. § 825.106(c) (emphasis supplied).  The Court simply cannot read the language of this regulation in a manner that would give rise to such an open and obvious conflict.  Therefore, the Court finds that Section 825.106(e) does not support Mahoney's claim.

**IV.    Conclusion**

Spherion, not Nokia, was Mahoney's primary employer, and therefore, under Section 825.106(c), Spherion, not Nokia, bore responsibility for addressing any request Mahoney made for an accommodation under the FMLA.  Further, Section 825.106(e) does not place the responsibility on Nokia as Mahoney's secondary employer to accommodate him.  Therefore, for the reasons stated herein, it is

     **ORDERED THAT** Nokia's Motion for Summary Judgment (Doc. 43) is GRANTED. This case is removed from the November 1, 2006 trial calendar. The Clerk is directed to enter judgment for Nokia and to close the file.

     **DONE** and **ORDERED** in Chambers, Orlando, Florida on July 28, 2006.

_____<br>
GREGORY A. PRESNELL<br>
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party